# United States Court of Appeals
## For the First Circuit

No. 13-2305

UNITED STATES OF AMERICA,

Appellee,

v.

EDISON BURGOS-MONTES,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF PUERTO RICO

[Hon. Jay A. García-Gregory, U.S. District Judge]

Before

Lynch, Chief Judge,
Howard and Kayatta, Circuit Judges.

Rachel Brill for appellant.
Francisco A. Besosa-Martínez, Assistant United States Attorney, with whom Rosa Emilia Rodríquez-Vélez, United States Attorney, and Nelson Pérez-Sosa, Assistant United States Attorney, Chief, Appellate Division, were on brief, for appellee.

May 13, 2015

**KAYATTA, Circuit Judge**. Edison Burgos-Montes ("Burgos") appeals from his conviction for two counts of drug conspiracy and two counts of murder. The latter stem from the disappearance of Burgos' girlfriend Madelin Semidey-Morales ("Semidey") shortly after Burgos learned that she had been acting as a government informant. Although the government sought the death penalty, the jury sentenced Burgos to life in prison. Burgos now challenges his conviction on a large number of grounds. For the reasons described in this opinion, we affirm the district court in full.

## I.  Background

In this appeal, Burgos challenges the sufficiency of the evidence supporting his conviction, the denial of several pre-trial motions to suppress evidence, and a number of other district court actions before and during trial. We typically recite those facts relevant to sufficiency claims and challenges to a denial of a motion to suppress in the light most favorable to the verdict or to the district court's ruling. See United States v. Bayes, 210 F.3d 64, 65-66 (1st Cir. 2000) (sufficiency); United States v. Soares, 521 F.3d 117, 118 (1st Cir. 2008) (suppression). For other issues, such as claims of prejudicial error, we offer a "balanced" treatment, see United States v. Felton, 417 F.3d 97, 99 (1st Cir. 2005), in which we "objectively view the evidence of record." United States v. Nelson-Rodríguez, 319 F.3d 12, 23 (1st Cir.

2003).[1]  Given that we cannot simultaneously recite the facts in both manners, we limit our initial summary of this lengthy record to those details essential to framing the issues on appeal.  We then offer the key facts relevant to each issue as part of our discussion of that issue, recited in the appropriate form.  We do the same for the standard of review for each issue.

In October 2004, Semidey agreed to work with agents of the federal Drug Enforcement Administration ("DEA") to inform on Burgos.  Semidey had begun dating Burgos while her husband was in jail, and she continued to do so after her husband was released.  Over the next nine months, Semidey moved in with Burgos and provided information to the DEA, arranged a meeting in which undercover officers negotiated a cocaine sale with Burgos (although

---

[1] In doing so, we note that this circuit has been inconsistent in its approach to reciting the facts of the case when considering a challenge other than the sufficiency of the evidence to support a conviction. See United States v. Rodríguez-Soler, 773 F.3d 289, 290 (1st Cir. 2014) (discussing the inconsistency).  Generally, though, the nature of the question on appeal and the applicable standard of review should make self-evident whether an appellate court should present the record largely in equipoise (for example, when it is assessing how an added or omitted item may have tipped the balance, see Felton, 417 F.3d at 99), or present the evidence as if the factfinder favored the prosecution's side of any factual disputes (to ascertain, for example, whether the evidence was sufficient to sustain the conviction, see United States v. Ayala-García, 574 F.3d 5, 8 (1st Cir. 2009)), or assume that the jury could well have been persuaded by the defendant's side of such disputes (to ascertain, for example, whether the failure to submit an element of the offense to the jury requires reversal in the absence of any objection to the failure, see United States v. Georgacarakos, 988 F.2d 1289, 1294-97 (1st Cir. 1993), abrogated on other grounds by United States v. Scott, 270 F.3d 30, 35 (1st Cir. 2001)).

the sale was never consummated), and recorded conversations between herself and Burgos. In these conversations, Burgos described, among other things, techniques for importing cocaine from the Dominican Republic to Puerto Rico, and the prices he generally charged for kilogram-quantities of cocaine. According to trial testimony, sometime around June 2005, one of Burgos' employees told Burgos that Semidey was an informant, a claim that Burgos investigated and confirmed. Semidey also told her handlers (according to her handlers) that Burgos had threatened to kill her over this rumor, and suggested that if she ever disappeared, agents should look for her body on a "farm" that Burgos owned. On July 4, 2005, Semidey disappeared after telling her handler that she had returned to Burgos' house. A witness at trial testified that she last saw Semidey getting into Burgos' car on the night Semidey disappeared. Two days later, law enforcement agents observed Burgos supervising an employee as the employee cleaned the inside of Burgos' car during a rainstorm.

After efforts to locate Semidey proved unsuccessful, DEA agents sought and received the authorization to wiretap Burgos' cell phone in September 2005. In December, DEA agents also recruited a co-conspirator named Neftalí Corales-Casiano ("Corales") to work as an informant. He recorded a number of telephone calls between himself and Burgos between December 20 and 28. Most incriminating was a December 28 conversation in which

Corales said he was concerned that Semidey's body would be found, to which Burgos replied, "It won't appear." On December 29, the government sought and received authorization to search Burgos' farm, as well as the car that agents had observed Burgos having an employee clean two days after Semidey disappeared. The search of the car revealed traces of blood that DNA analysis suggested was Semidey's. Semidey never reappeared, and her body was never found.

In January 2006, Burgos was indicted for conspiring to import and conspiring to possess with intent to distribute controlled substances in violation of 21 U.S.C. §§ 846, 841(a), 963, and 952. The indictment described a conspiracy lasting from 1998 to 2005, and described a number of acts in furtherance of the conspiracy that took place primarily between January and June 2005, including discussions with unindicted co-conspirators about arrangements to purchase between one and ten kilograms of cocaine, and stealing a boat. A May 2006 superseding indictment added two murder counts, stemming from Semidey's disappearance. The indictment charged that Burgos had murdered Semidey to prevent her from communicating with law enforcement and to retaliate against her for communicating with law enforcement in violation of 18 U.S.C. §§ 1512(a)(1)(A) and (C), and 1513(a)(1)(B).[2] The

_____

[2] The indictment also included a forfeiture count that is not at issue in this appeal.

government also notified Burgos that it would seek the death penalty.

In the lead-up to trial, Burgos filed a number of motions seeking to strike the death penalty, all of which were denied. He also filed numerous motions to suppress evidence. Although the district court granted some of his motions to suppress, it denied both a motion to suppress the evidence obtained through the wiretap, United States v. Burgos Montes, No. 06-009-01(JAG), 2010 WL 5184844, at *13 (D.P.R. Dec. 20, 2010), and a motion to suppress evidence from the search of Burgos' car and farm. United States v. Burgos Montes, No. Crim. 06-009 JAG, 2011 WL 1743420, at *1 (D.P.R. May 2, 2011).

After hearing thirty days of evidence, the jury convicted Burgos on all four counts. During the penalty phase of the trial, Burgos raised allegations of possible juror bias. The district court held an in camera meeting with the juror in the presence of counsel and determined that there was no bias, so the juror returned to the box and the penalty phase continued. On the basis of this episode, Burgos filed a motion for acquittal or new trial. He also moved for acquittal or new trial on the basis that the evidence fell short of the minimum sufficient to convict.[3] The

---

[3] Burgos argued that there was insufficient evidence that Burgos intended to kill Semidey because she was an informant, as opposed to for some other reason. He also argued that the evidence presented at trial constituted a fatal variance from that charged in the indictment. The latter argument was also the basis of a

court denied both motions in a sealed order. Because the jury could not reach a unanimous verdict on the death penalty, Burgos was sentenced to life imprisonment.

Burgos filed a timely notice of appeal challenging: (1) the denial of the motion to suppress evidence from the wiretap, (2) the denial of the motion to suppress evidence from the search of the car and farm, (3) the denial of the motion for acquittal or new trial on the basis of alleged jury bias, (4) the denial of the motions to strike the death penalty, (5) the denial of the motions to acquit or for a new trial based on the sufficiency of the evidence, and (6) various evidentiary rulings.

## II. Analysis

### A. Motion To Suppress Wiretap Evidence

Burgos challenges the district court's denial, after an evidentiary hearing, of his motion to suppress a number of conversations recorded through a wiretap of his cell phone after Semidey disappeared. The wiretap was authorized under Title III of the Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C. §§ 2510-22, which imposes a set of statutory requirements on top of the constitutional requirements applicable to ordinary search warrants. See United States v. Nelson-Rodríguez, 319 F.3d 12, 32 (1st Cir. 2003). Burgos advances four primary challenges to the wiretap, which we address in turn.

---

mistrial motion that the district court denied in open court.

-7-

### 1.    "Omitted" Information About Semidey

Burgos' first argument is that in the affidavit in support of their wiretap application, the DEA agents omitted information about Semidey that, had it been included, would have precluded a finding of probable cause under the Fourth Amendment of the United States Constitution.  In assessing such an argument (assuming the omitted information was intentionally or recklessly withheld), we ask whether the application, had it contained the omitted information, would still have provided a "sufficient" basis for authorizing the wiretap.[4]  United States v. Young, 877 F.2d 1099, 1102-03 (1st Cir. 1989) (citing Franks v. Delaware, 438 U.S. 154, 171-72 (1978)).

The government's application for authorization to conduct a thirty-day wiretap of Burgos' cell phone was supported by a thirty-seven-page affidavit filed by DEA Agent Jacobsen, with the participation of Agent Iglesias, who was the lead agent on the case.  The affidavit described the investigation as being led by the DEA and involving the FBI, the Puerto Rico Police Department, and two Puerto Rico investigative units, the Hacienda and the NIE.

---

[4] Young used several terms to describe the standard it was applying to the reformed affidavit, including "adequate," "sufficient," and whether the omissions were "material" to a finding of probable cause.  877 F.2d at 1102-04  There is nothing to suggest the court intended the terms to convey different meanings; indeed, its reliance on Franks makes clear it was applying a sufficiency standard.  Franks, 438 U.S. at 171-72 (asking whether a reformed affidavit contained "sufficient content . . . to support a finding of probable cause").

In addition to Burgos, one of the five targeted individuals was Corales, whom the affidavit described as a former police officer who was fired for corruption allegations in 1997, and who had multiple felony arrests and convictions between 1995 and 1998.

The evidence supporting the affidavit consisted of information from three confidential sources, including Semidey (through her reports submitted prior to her disappearance). The first two sources described the activities of named individuals believed to be lower-level members of a drug trafficking conspiracy that brought cocaine into Puerto Rico from the Dominican Republic. The evidence connecting Burgos to drug trafficking came from or through Semidey. According to the affidavit, she described conversations in which Burgos said he could procure large amounts of cocaine. She also helped arrange a meeting between Burgos and undercover officers, which was recorded, and in which the officers arranged a cocaine purchase. Toll registers confirmed that Burgos was in contact with the people that Semidey said he called to discuss the planned sale to the officers. Burgos never delivered any drugs, however.

The application also described Semidey's statements that Burgos suspected the undercover officers were officers and that he had confronted her with a rumor that she was cooperating. According to the affidavit, Burgos threatened to make her "disappear from the earth." It also described Semidey's

disappearance on July 4, 2005, and agents' observations of Burgos supervising as an employee "rigorously" washed the interior of Burgos' car during a rainstorm on July 6.

The affidavit described Semidey as a paid informant who was cooperating for personal reasons. It then described her observations of Burgos' drug activities, her role in helping to arrange a failed buy-bust, the fact that Burgos had threatened her, and her disappearance. "Omitted" from the affidavit were the facts that Semidey was in a relationship with Burgos, that she was married to another man who had been released from prison shortly before she agreed to inform on Burgos, and that she may have been trying to avoid prosecution on unrelated charges.[5]

Nothing in these omitted facts materially undercuts the affidavit's ample demonstration of probable cause. The omitted information furnishes, at best, grist for a somewhat conjectural and by no means strong argument that one might make to discredit Semidey. None of this grist is so probative as to make its omission particularly notable. See Young, 877 F.2d at 1103 ("The law does not require an officer swearing out an affidavit for a warrant to include all possible impeachment material. It need only explain that the officer has found the informant to be reasonably reliable."). We note, too, that key portions of Semidey's

_____

[5] While there was trial testimony by Semidey's mother and sister that Semidey agreed to be an informant to avoid possible prosecution in another matter, the DEA agents involved denied this.

-10-

statements in the affidavit were corroborated within the affidavit itself. The affidavit reflects that after Semidey introduced Burgos to undercover agents, Burgos himself spoke with undercover agents on at least three occasions regarding a potential cocaine sale. Moreover, toll records corroborated Semidey's descriptions of Burgos' telephone communications about this potential sale.

In sum, even had the affidavit included the omitted information, the affidavit would easily have contained a sufficient basis for concluding that a wiretap would produce evidence that Burgos was involved in a drug conspiracy or murder. Burgos' challenge to the wiretap based on this "omission" of information concerning Semidey therefore fails.[6] Young, 877 F.2d at 1102.

### 2. "Omitted" Information About Corales

Burgos' next argument trains on the so-called "necessity" requirement of 18 U.S.C. § 2518(1)(c). This subsection provides that wiretaps are generally only available when the government shows with a "full and complete statement . . . whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous." Id.

---

[6] Our conclusion that the affidavit contained a sufficient basis to establish probable cause for the wiretap at the time of the Title III application also disposes of Burgos' argument that the information contained in the affidavit was "stale."

According to Burgos, the affidavit's claim that a wiretap was necessary was deficient because it did not provide "full and complete" information about Corales. Specifically, Burgos argues that the affidavit did not give any indication that Corales had sometimes worked as an informant and could potentially be used as one in this investigation. Burgos argues that a wiretap could not have been necessary until the government first tried to use Corales as an informant.

In considering a claim that improperly omitted facts undermine the necessity of a wiretap, we use a similar approach to that which we use to assess a claim that such omissions undermine probable cause: we ask whether, had the omitted information been included, there would still have been a "minimally adequate" basis for determining that the wiretap was necessary.[7] See United States v. Cartagena, 593 F.3d 104, 109-11 (1st Cir. 2010).

The answer to this question is "yes." The affidavit explained why normal investigative techniques were not expected to yield results. In particular, agents had twice tried and failed to arrange a buy-bust, and using other informants was dangerous, given what appeared to have happened to Semidey. That explanation provides more than adequate support for a conclusion that the exigencies did not warrant further delay in order to try to recruit

---

[7] We do not read the "minimally adequate" standard to differ substantively from the sufficiency standard applied to a challenge that omissions undermine probable cause. See footnote 4, supra.

yet another confidential informant, much less for what appeared to be an exceedingly dangerous mission. See 18 U.S.C. § 2518(1)(c) (recognizing that some investigative techniques may be "too dangerous"). Whether Corales could have been recruited as an informant (or even the fact that he later acquired his own reasons to volunteer as an informant, as discussed in footnote 10 of this opinion) is therefore beside the point.

### 3. Sealing Of The Wiretap Recordings

We now turn to Burgos' argument that the wiretap application failed to comply with certain procedural requirements under 18 U.S.C. § 2518(8)(a). That subsection provides that "[i]mmediately upon the expiration of the period of the order" authorizing a wiretap, "such recordings shall be made available to the judge issuing such order and sealed under his directions." Id. It further provides that "[t]he presence of the seal provided for by this subsection, or a satisfactory explanation for the absence thereof" is a prerequisite for any use of the evidence. Id.

Burgos makes two arguments: (1) that the records were not sealed "immediately," because the government ended the wiretap on September 30 but the recordings were not sealed until October 7, and (2) that they were not sealed by the same judge who had issued the order. The government does not dispute these deviations from the statutory requirements. It argues, however, that because it has offered a "satisfactory explanation" for the late sealing, and

-13-

because the use of a different judge is immaterial, the recordings need not be suppressed. After an evidentiary hearing to consider the issue of sealing, the district court denied Burgos' motion to suppress the wiretap evidence on these grounds. Burgos Montes, 2010 WL 5184844, at *5-8.

Before turning to the substance, we must first address the threshold issue of the proper standard of review. Neither party points us to a standard of review for the question of whether the government's explanation for the absence of a seal that complies with the requirements of section 2518(8)(a) is "satisfactory." It appears that this circuit has never expressly articulated one. Other circuits are split, with some employing a clearly erroneous standard, see, e.g., United States v. Coney, 407 F.3d 871, 874 (7th Cir. 2005), and others applying plenary review to the question of whether the explanation is satisfactory, even though subsidiary factual questions are reviewed for clear error, see, e.g., United States v. Sawyers, 963 F.2d 157, 159 (8th Cir. 1992). In United States v. Mora, 821 F.2d 860, 869-70 (1st Cir. 1987), which articulated the factors that define a "satisfactory explanation" in this circuit, we accepted the district court's supported subsidiary factual findings, but applied de novo review to whether those facts were satisfactory under the newly announced test. We will follow in those footsteps.

-14-

In assessing the ramifications of an untimely sealing, Mora established that the key inquiry was whether the government had proven "by clear and convincing evidence that the integrity of the tapes ha[d] not been compromised." Id. at 867. Sealing helps ensure and demonstrate a lack of tampering. To the extent that there is any delay in sealing, the field may open more widely for the defendant to question and explore what happened to the records pre-sealing.

Here, the district court concluded that Iglesias was credible in his testimony that the "recordings were kept in a manner that sufficiently excludes the possibility of tampering," and noted that Burgos had not even argued that they had been tampered with. Burgos Montes, 2010 WL 5184844, at *7. On appeal, Burgos again offers no allegations of tampering. While the burden of proof is on the government, this does not mean the government must prove a negative when the defendant does not even allege that tampering has taken place. Burgos also does not offer any facts speaking to the other factors in Mora, particularly indications of bad faith by law enforcement personnel or prejudice to him--his argument simply turns on the bare fact that seven days is not "immediately." However, in Mora itself, the court found that delays of twenty and forty-one days, while concerning, did not automatically require suppression in light of the other factors. Id. at 869. We conclude the same here regarding the seven-day

-15-

delay, given the lack of any evidence of tampering or other possible prejudice, and the lack of evidence of bad faith.

We can also quickly dispense with Burgos' objection to the sealing of the recordings by a judge other than the one who approved the wiretap.  When Iglesias took the recordings to the issuing judge, he was told that the judge was unavailable and was sent to a different judge, who sealed them.  Burgos cites no case where recordings have been suppressed under such circumstances. Few cases have addressed the issue at all, although the Second Circuit has suggested in dictum that when the issuing judge's unavailability would result in a delay, sealing by a non-issuing judge is permissible.  United States v. Poeta, 455 F.2d 117, 122 (2d Cir. 1972).  As a purely textual matter, the agents appear to have complied with the statute in that they "made [the recordings] available to the [issuing] judge" and followed her "direction[]" to take them to a different judge for sealing.  Thus, this argument also fails.

**4.    Miscellaneous Shots At The Warrant**

Burgos lobs a number of other arguments at the substance of the affidavit, none of which give us significant pause.  He argues that the affidavit was not full and complete because some statements were too vague, and because it includes a one-sentence disclaimer that the affidavit included only information relevant to the wiretap application and not all of the information from the

-16-

entire investigation. These arguments fail on the grounds that an affidavit need not include the "minutiae" of an investigation. See Cartagena, 593 F.3d at 110; see also United States v. Yeje-Cabrera, 430 F.3d 1, 9-10 (1st Cir. 2005).

Burgos also complains that the affidavit's authorization to include individuals "yet unknown" violates the requirement that the application include "the identity of the person, if known, committing the offense and whose communications are to be intercepted." 18 U.S.C. § 2518(1)(b)(iv). He argues that the government knew the names of certain other individuals that would eventually be recorded and failed to include them. In United States v. Donovan, 429 U.S. 413 (1977), the Court held that this requirement to identify individuals extends to those whose conversations the government has probable cause to believe would be intercepted. Although it is typically the unnamed individuals who challenge a wiretap under such circumstances, see id. at 428; see also United States v. Chiarizio, 525 F.2d 289, 291-93 (2d Cir. 1975), we will assume without deciding that a named individual can also bring such a challenge because it does not affect the outcome here.[8] Nevertheless, Burgos offers no facts establishing that the

---

[8] While this would make little sense in the Fourth Amendment context, where the named individual would be asserting the unnamed individual's rights, in this context the named individual is claiming that his conversations were recorded pursuant to a statutorily deficient wiretap, even though it is difficult to see how the deficiency could be prejudicial.

government had probable cause to believe that the other individuals would be intercepted on the targeted telephone, so this argument also fails.

## B.  Motion To Suppress Evidence From Burgos' Car And Farm

Burgos next challenges on a number of grounds the denial of his motion to suppress evidence seized from his car and farm pursuant to a search warrant.  As with the wiretap warrant, Burgos argues that the application for the warrant was deficient because of omissions and inaccuracies in the application.  In considering such a challenge, our approach is similar to the one we used with regard to the wiretap:  "we excise the offending inaccuracies and insert the facts recklessly omitted, and then determine whether or not the 'corrected' warrant affidavit would establish probable cause."  Burke v. Town of Walpole, 405 F.3d 66, 82 (1st Cir. 2005) (quoting Wilson v. Russo, 212 F.3d 781, 789 (3d Cir. 2000)).[9] Burgos also argues that the application did not satisfy the "particularity" requirement of the Fourth Amendment.  In reviewing the denial of a motion to suppress based on such a claim, we review the district court's fact-finding for clear error, and conclusions of law de novo.  United States v. Kuc, 737 F.3d 129, 132 (1st Cir. 2013).

---

[9] While the rule applies to omissions made with intentional or reckless disregard for the truth, see Burke, 405 F.3d at 81-82, we need not decide whether or not the omissions here were reckless or intentional, because either way, they do not undermine probable cause.

## 1. "Omitted" Information About Corales and Semidey

A warrant application must include sufficient information to establish probable cause both that a crime has been committed, and that evidence of the crime will be found in the place to be searched. United States v. Hicks, 575 F.3d 130, 136 (1st Cir. 2009). Burgos argues that the application for the warrant was deficient because it omitted material information undermining the credibility of Semidey and Corales, whose statements comprised much of the information in the affidavit. Burgos again argues that the affidavit did not explain the nature of Semidey's relationship with Burgos or her potential motivations for serving as an informant, nor the fact that Corales was a disgraced former cop with a history of perjury and multiple felony convictions.

The affidavit provided the following as a basis for probable cause:

- Semidey's statements to a DEA agent that Burgos had confronted her with a rumor that she was an informant, and had threatened to kill her;

- Semidey's statements that if she ever disappeared, law enforcement should look for her on Burgos' farm;

- Observations of Burgos having an employee "rigorously" wash the interior of his car in the rain two days after Semidey disappeared and shortly after the police contacted him with questions about Semidey;

- High call volume from Burgos' phone to Semidey's that stopped the night of her disappearance, followed by a single call to her number after the police contacted him about her disappearance;

- Visual observations by Iglesias of "what appeared to be a newly turned area of earth in the approximate dimensions of a grave" on the farm;

- A recording of a call between Burgos and co-conspirator Radamés Castillo-Martinez ("Castillo") in which Castillo said he was concerned that something might have happened to Burgos because of "this girl";

- Statements by Corales and Castillo that Burgos knew Semidey was an informant;

- Several statements by Corales, identified in the affidavit as "CS #2," recounting conversations in which Burgos said he was not concerned to hear that co-conspirator Castillo had been arrested because he was confident that the police were not going to find Semidey; that the DEA would have arrested him by then if it could; and that he didn't understand how Semidey could have "cause[d] damage" to him after he had paid her bills and her children's living expenses;[10]

---

[10] Corales volunteered to serve as an informant in December 2005, after he learned that co-conspirator Castillo had been arrested on charges related to their preparations to import cocaine

- A conversation between Corales and Burgos in which Burgos said that Semidey's body "won't appear" and that "[t]hey can look for her in Yauco, Ponce, and Mayaguez and they're not going to find her." In the conversation, Burgos and Corales also made plans to bury a stolen boat on the farm. (This conversation was recorded, although the affidavit does not make that clear.);

- Corales' statement that he believed Semidey may be buried on the farm.

This evidence clearly suffices to establish probable cause, even considering the affidavit in light of the omitted information about Semidey and Corales. In particular, the credibility of Semidey's statements that Burgos had threatened her are not undercut by the kind of information that might cast doubt on her credibility with regard to Burgos' drug activities. When informant Jane reports that target John threatened to kill her because John learned that Jane is an informant, and Jane then disappears after last being seen getting into John's car, after which John is seen washing the car in a rainstorm, it almost goes without saying that there exists probable cause to conduct further investigations into John no matter what one thinks about Jane's motives for serving as an informant. See United States v. Hibbard, 963 F.2d 1100, 1101-02 (8th Cir. 1992) (upholding a warrant

from the Dominican Republic.

-21-

authorizing the search of defendant's residence for the whereabouts of a missing person based entirely on the fact that the defendant had threatened the victim and that the victim was last seen in the defendant's presence).  Whatever additional corroboration such statements might need is amply provided for by the recorded conversation between Burgos and Corales in which Burgos stated that Semidey was not going to appear.  In short, nothing in the omitted evidence cast any material doubt on Semidey's statements relevant to the warrant application.

As for Corales, the corroborating information not dependent on his credibility is sufficient to establish a nexus to the car and the farm.  The search of the car was based primarily on agents' observations of Burgos having the car's interior washed in the rain two days after Semidey disappeared, and shortly after law enforcement went to Burgos house to attempt to question him.  As for the farm, the affidavit established a nexus based on Semidey's statements that law enforcement should look for her body on the farm if she disappeared, as well as the recorded conversation in which Burgos and Corales agreed to bury a boat on the farm.  Thus, even considering the affidavit in light of Corales' potential unreliability, there is a sufficient basis for probable cause.

## 2.    Other Probable Cause Arguments

Burgos makes several other arguments for why the warrant failed to establish probable cause.  First, he points to certain

inaccuracies in the warrant's description of events. In particular, he argues that Iglesias' trial testimony regarding his observations of disturbed earth on the farm appear to vary from his description in the affidavit. As discussed above, however, probable cause existed even without the observation of the disturbed earth, so we need not delve into this argument. As for the car, Burgos attempts to build a probable cause challenge based on the fact that the affidavit described Burgos washing the inside of his vehicle with an employee, while testimony in the suppression hearing made clear that Burgos was actually supervising the employee and did not participate in the washing himself. Burgos argues that having a third party wash the car is inconsistent with an attempt to remove evidence of a crime, where one would expect great secrecy. However, the description of the car-washing in the affidavit does indicate that a third party, who seemed to be Burgos' employee, was involved, so this minor difference in how Iglesias described the event is not material.

Finally, Burgos makes a staleness argument based on the passage of time between Semidey's disappearance in July 2005 and the government's application for a search warrant in December, after Corales agreed to cooperate. Burgos argues that even if there was probable cause to believe that there had once been evidence in the car, the affidavit did not include any reason to believe that it would have still remained six months later. An

allegation of staleness is evaluated not merely on how old the information is, but circumstances including the nature of the suspected crime, the character of the items to be seized, the habits of the suspect, and the nature of the premises to be searched. United States v. Bucuvalas, 970 F.2d 937, 940 (1st Cir. 1992), abrogated on other grounds by Cleveland v. United States, 531 U.S. 12, 18 (2000). Burgos cites no case where evidence was suppressed on the basis of a failure to state the common-sense notions that bodies often stay where they are disposed of, and that DNA evidence can last longer than six months, and we decline to announce such a rule here--particularly given that the passage of time without Semidey's reappearance made foul play appear increasingly more likely.

### 3. Particularity

Burgos next argues that the search warrant violates the Constitutional requirement that a warrant must "particularly describ[e] . . . [the] things to be seized." U.S. Const. amend. IV. The warrant authorizes a search for "[e]vidence and trace evidence relevant to the homicide of Madelin Semidey-Morales in violation of Title 18, United States Code, Section 1513. See also the attached affidavit, which is hereby incorporated and made part hereof." Burgos argues that "evidence and trace evidence" is insufficiently particular, and that the failure to define the kind of "trace evidence" sought was particularly egregious because

Iglesias admitted that he used the broad term precisely to avoid limiting the forensic analysis.

Although federal courts do not generally uphold warrants authorizing the search for "evidence of crime X" unless that statement follows a list of illustrative examples, see United States v. Bithoney, 631 F.2d 1, 2-3 & n.1 (1st Cir. 1980), Burgos' argument fails because the warrant incorporates by reference the affidavit, which describes the target of the search as "the person, or remains, of Madelin Semidey-Morales, evidence of the manner of her death and her personal effects." Affidavit language expressly incorporated by the warrant can satisfy the particularity requirement. See Rivera Rodríguez v. Beninato, 469 F.3d 1, 5 (1st Cir. 2006); cf. Groh v. Ramirez, 540 U.S. 551, 557-58 (2004) (collecting circuit cases allowing incorporation by reference and leaving open the possibility of incorporation). While there still exists some generality in terms like "evidence of the manner of her death" and "her personal effects," this is a situation in which the "circumstances of the crime make an exact description of the fruits and instrumentalities a virtual impossibility." United States v. Timpani, 665 F.2d 1, 5 (1st Cir. 1981) (quoting Spinelli v. United States, 382 F.2d 871, 886 (8th Cir. 1967)). In such cases, "the searching officer can only be expected to describe the generic class of items he is seeking." Id. (quoting Spinelli, 382 F.2d at 886).

### 4.    Compliance With Rule 41(e)

Burgos next attacks the warrant on the grounds that the issuing magistrate failed to fill in two of the spaces on the pre-printed warrant form:  one for the date by which the warrant was to be executed, and one for the judge to whom the warrant should be returned.  (The space on the form for the return date is followed by the parenthetical "not to exceed 10 days.")  Burgos argues that these omissions violate Federal Rule of Criminal Procedure 41(e)(2)(A) (2009), which required the warrant to "command the officer . . . to execute the warrant within a specified time not longer than 10 days" and to "return the warrant to the magistrate judge designated in the warrant," and that such violation mandates suppression.[11]

In United States v. Bonner, 808 F.2d 864 (1st Cir. 1986), we considered a different subdivision of Rule 41, one providing that officers must leave a copy of the warrant at the place to be searched.  See Fed. R. Crim. P. 41(f)(1)(c).[12]  We held that because the subdivision is "ministerial," a violation does not require suppression unless the defendant can demonstrate prejudice. Bonner, 808 F.2d at 869.  Prejudice means being "subjected to a search that might not have occurred or would not have been so

---

[11] In 2009, Congress amended Rule 41(e), increasing to 14 days the time to execute the warrant.

[12] At the time Bonner was decided, the subdivision was numbered 41(d).

-26-

abrasive" had the rules been followed.  <u>Id.</u> (internal quotation marks omitted).  Other circuits have held the same applies to all the prerequisites of Rule 41.  <u>See</u> <u>United States</u> v. <u>Schoenheit</u>, 856 F.2d 74, 76-77 (8th Cir. 1988); <u>United States</u> v. <u>Burke</u>, 517 F.2d 377, 386-87 (2d Cir. 1975).

We have little trouble concluding that the prejudicial error rule of <u>Bonner</u> should extend to the failure by the issuing magistrate to define the time period of the search when the form itself provides that the search is to be completed within the time frame specified by the rule, and to the failure to designate a magistrate to whom the form should be returned. "The exclusionary rule should be limited to those situations where its remedial objectives are best served, i.e., to deter illegal police conduct, not mistakes by judges and magistrates."  <u>Bonner</u>, 808 F.2d at 867 (citing <u>United States</u> v. <u>Leon</u>, 468 U.S. 897, 908, 916 (1984)).  Burgos does not suggest why he was prejudiced by the warrant's technical failings.  Absent a showing of prejudice, there is no basis for suppressing the evidence.[13]

**5.  Fruit Of The Poisonous Tree**

While serving as an informant, Semidey (against her handlers' instructions) took a number of documents--including some

_____

[13] The warrant was executed in compliance with the 10-day statutory maximum in effect at the time, and Burgos does not argue it was not.  The warrant was issued on December 29, 2005; the search of the farm took place on December 30 and 31, 2005, and the search of the car took place on January 5, 2006.

pertaining to the farm--from Burgos' residence. The physical evidence of this unconstitutional search was suppressed. Burgos now argues that any evidence from the farm should be suppressed as the fruit of the poisonous tree. The district court denied the motion to suppress on the grounds that a search of the farm was inevitable. See United States v. Scott, 270 F.3d 30, 42-45 (1st Cir. 2001) (explaining the inevitable discovery doctrine). On appeal, Burgos argues in a single conclusory sentence that the government has not met its burden of proving by a preponderance of the evidence that the farm would have been discovered by lawful means. He does not challenge the specific evidence from which the district court concluded that discovery was inevitable: DEA agents' conversations with Semidey and Corales, as well as an instance where local police seized some stolen containers from the property. This argument, even if not waived for perfunctory briefing, see United States v. Zannino, 895 F.2d 1, 16 (1st Cir. 1990), fails in the face of the evidence found persuasive by the district court.

## C. Juror Bias

We now turn to Burgos' claim that the district court abused its discretion when it first failed to hold an evidentiary hearing to investigate allegations of juror bias, and then failed to grant a new trial on account of that alleged bias, all in violation of Burgos' Sixth Amendment right to a trial by impartial

jury. U.S. Const. amend. VI. This claim arises out of an incident during the sentencing phase of trial in which a juror appeared to slump in his chair when a man we will call Juan walked into the room. Juan was married to one of the witnesses who testified for the defense in the penalty phase. At the next break, Juan told defense counsel that he was a second cousin of the juror (their grandmothers were sisters). Defense counsel told the judge that the juror was appearing to hide from Juan.

The judge held an in camera meeting in which he asked the juror if he recognized anyone in the court room that day. The juror said he had not recognized anyone "involved in the case," and stressed that if he recognized anyone, he would speak up.[14] The district court asked several more times (e.g., "So far in the case, you haven't recognized anybody?"). To each question, the juror responded that he had not, and that "[i]f I . . . recognize somebody, I will tell the Court. But I didn't." He also explained that he slumped because he was uncomfortable, and that although he had grown up the part of Puerto Rico where the events at issue had taken place, he had moved away from his hometown more than two decades before, and rarely returned to visit. The court also asked specifically if he recognized the name "Juan," and the juror responded that he did not.

---

[14] "I'm telling the truth, if in any case I would recognize anybody of the persons involved in the case, it would come from me to tell the Court . . . . I haven't."

Satisfied with the juror's credibility, the district court continued the penalty phase of the trial. Based on this episode, Burgos filed a motion for acquittal or new trial and requested an evidentiary hearing. His motion also raised the new argument that a defense witness from the guilt phase was also related to the juror (her father was the juror's mother's cousin).[15] The district court denied this motion on the grounds that the juror was credible when he said he didn't recognize anyone in the proceedings, and that moreover there hadn't been even a suggestion that he had recognized the witness during the guilt phase. Burgos now appeals the denial of this motion.

Burgos can hardly complain now that the district court failed to remove the juror. After all, the only jury finding made after Burgos raised the issue favored Burgos by rejecting the death penalty. So he must train his argument on a claim that the district court abused its discretion by failing to grant a new trial because of later-discovered bias relevant to the guilt phase. All Burgos has to go on is his belated complaint that a witness he himself had called was a distant cousin of the juror. Because the district court took as credible the juror's statement that he did not recognize anyone in the proceedings, Burgos instead makes an argument based on implied bias: that either the bare fact of a

_____

[15] In the motion, Burgos also raised a number of even more attenuated connections.

blood relationship, or the fact that the juror lied about the existence of a blood relationship, is sufficient to imply bias as a matter of law.  See Amirault v. Fair, 968 F.2d 1404, 1406 (1st Cir. 1992) (per curiam).

Neither argument prevails.  First, the district court concluded that the juror did not lie about not recognizing anyone in the proceedings, and nothing suggests that finding was clearly erroneous.  See id. at 1405 (stating that a court's findings of juror credibility merit "great deference").  As for the bare fact that the juror and the witness were distant cousins, implied bias requires "exceptional" or "extreme" circumstances, id. at 1406 (quoting Smith v. Phillips, 455 U.S. 209, 222 (1982) (O'Connor, J., concurring)), and we cannot conclude that the district court erred in finding the situation fell well short of this mark, given that the familial connections were so attenuated that no one during the guilt phase seems to have even noticed that the witness and the juror were distant cousins.

Burgos' alternative argument challenges the procedure employed by the district court.  He says that the court erred by investigating the claim of juror bias through an in camera discussion, rather than an evidentiary hearing.  The case law suggests otherwise.  While a district court must make an "adequate inquiry" into non-frivolous claims of juror bias or misconduct, United States v. Ortiz-Arrigoitia, 996 F.2d 436, 442 (1st Cir.

1993), the district court has "broad discretion to determine the type of investigation which must be mounted." United States v. Boylan, 898 F.2d 230, 258 (1st Cir. 1990). The court "may, but need not, convene a full-blown evidentiary hearing." Id. We review the district court's determination of how to investigate such claims for patent abuse of discretion. Id.

The district court certainly did not patently abuse that broad discretion here. The relevant question is not whether the juror was actually related to anyone in the proceedings; it is whether such a relationship, if it exists, biased the juror against the defendant. Indeed, the district court accepted that the juror may have been related to the witness, but it credited the juror's testimony that he did not recognize anyone, let alone harbor any bias against the defendant as a result of that unrecognized relationship with a witness for the defense. Thus, while an evidentiary hearing could conceivably have proven the relationships if they were at issue, they were not at issue. The district court did not patently abuse its discretion.

## D. Trial Before A Death-Qualified Jury

Prior to trial, Burgos filed a number of motions challenging the government's decision to seek the death penalty. The district court denied them all. Burgos was tried before a death-qualified jury, and sentenced to life in prison. He now argues that because he never should have faced the death penalty,

his trial before a death-qualified jury violated his Sixth Amendment rights.

For his argument that he never should have faced the death penalty in the first place, Burgos simply incorporates by reference his pre-trial motions, offering no arguments for why the district court erred in dismissing those motions. Arguments incorporated into a brief solely by reference to district court filings are deemed waived. See Exec. Leasing Corp. v. Banco Popular de P.R., 48 F.3d 66, 67-68 (1st Cir. 1995). As such, Burgos has waived his argument that the district court erred when it rejected his various motions to strike the death penalty.

Given a proper death penalty charge, it is well established that using a death-qualified jury for the guilt phase does not violate a defendant's Sixth Amendment rights. Buchanan v. Kentucky, 483 U.S. 402, 414-16 (1987). Here, Burgos faced charges of murdering Semidey to prevent her from, or in retaliation for, communicating with law enforcement in violation of 18 U.S.C. §§ 1512(a)(1)(A) and (C), and 1513(a)(1)(B), and the death penalty is available for these violations as a matter of law. Id. §§ 1111(b), 1512(a)(3)(A), 1513(a)(2)(A). Thus, there has been no Sixth Amendment violation.

## E.    Sufficiency Of The Evidence

Burgos next appeals from the order denying his motion for acquittal or new trial on the basis of insufficient evidence to

convict.  This court reviews a denial of a Rule 29 motion for acquittal based on insufficiency of the evidence de novo, examining the evidence in the light most favorable to the verdict,  United States v. Troy, 583 F.3d 20, 24 (1st Cir. 2009), and asking whether a rational jury could find guilt beyond a reasonable doubt, United States v. Andujar, 49 F.3d 16, 20 (1st Cir. 1995).  A district court's denial of a motion for a new trial is reviewed for manifest abuse of discretion.  United States v. González-González, 136 F.3d 6, 12 (1st Cir. 1998).

Burgos argues that the government presented insufficient evidence that he killed Semidey with the intent to prevent her attendance or testimony in an official proceeding, 18 U.S.C. § 1512(a)(1)(A), to "prevent a communication about the commission or possible commission of a federal offense to a federal law enforcement officer," id. § 1512(a)(1)(C), or to "retaliate" for providing such information, id. § 1513(a)(1)(B).  As Burgos would have it, the evidence at worst established two equally plausible reasons for him to have killed Semidey:  he killed her in a domestic dispute because they had an argument three days before her disappearance that, according to trial testimony, did not seem to have anything to do with her being an informant,[16] or he killed her

---

[16] Semidey's mother testified that the fight began when Burgos said he wouldn't sell a kilogram of cocaine to a certain person and Semidey said she would have sold the drugs.  Her mother then responded affirmatively to defense counsel's characterizing the fight as being about the fact that Burgos didn't like that Semidey

because of her informing.  Alternatively, he says that it was equally plausible that another member of the conspiracy killed her.

We agree with the district court that these other theories were not equally plausible.  The jury heard testimony that Burgos tried several times to confirm whether or not Semidey was an informant, that he concluded that she was, and that he had threatened to kill her and "make her disappear from the face of the earth" if he ever found out that she was cooperating with the government.  The jury heard, too, evidence of Burgos' drug-related activities and Semidey's knowledge of those activities, providing him with ample motive to make sure she never testified against him.  If Burgos was merely unhappy with his non-marital relationship, he had numerous options for ending that relationship.  If he was unhappy because Semidey was a government informant clearly possessed of knowledge sufficient to convict him, he had fewer reliable options available to him other than murder, or so the jury could reasonably have concluded.

## F.   Prejudicial Variance

Burgos then argues that the evidence presented at trial regarding the duration of the drug conspiracy constituted a fatal

---

was "acting like a drug dealer."  Agent Iglesias also testified that Semidey told him that the fight had to do with Burgos' reluctance to sell drugs to a certain person.

variance from that charged in the indictment.[17]  Burgos was charged with one count of conspiracy to possess cocaine with intent to distribute, and one of conspiracy to import cocaine, both of which were charged to have extended from 1998 to 2005.  Burgos argues that because the only evidence of the conspiracy in the 1998-99 time frame came from Corales, who was in prison for six months starting in 2001, and who also testified as a witness for the government in an unrelated murder case, there could not have been a continuous 1998-2005 conspiracy to import and distribute cocaine. He argues that at best, the government has presented evidence of two distinct conspiracies (a distribution conspiracy in 1998-99, and a conspiracy to import and distribute in 2004-05[18]), creating a fatal variance from the 1998-2005 conspiracy charged in the indictment.

To determine whether a variance exists, we "review the record to determine whether the evidence and reasonable inferences therefrom, taken as a whole and in the light most favorable to the prosecution, would allow a rational jury to determine beyond a

---

[17] Burgos preserved this objection below through a mistrial motion that the district court denied in open court.

[18] Burgos' view of the events could arguably be characterized as three or four conspiracies:  separate importation and distribution conspiracies in both 2004-05 and 1998-99, although as we discuss below, he argues that there was no evidence of an importation conspiracy in 1998-99.  However, because his primary complaint turns on two distinct periods of time, we follow his lead in referring to only "two" conspiracies.

reasonable doubt that a single conspiracy existed." United States v. Manqual-Santiago, 562 F.3d 411, 421 (1st Cir. 2009) (internal quotation marks omitted). "Although conflicting inferences may arise, so long as the evidence is adequate to permit a reasonable trier of fact to have found a single conspiracy beyond a reasonable doubt, the jury's finding will not be disturbed on appeal." Id. Even if we find a variance, it "does not warrant reversal unless it is prejudicial." United States v. Yelaun, 541 F.3d 415, 419 (1st Cir. 2008). We review de novo the question of whether a variance was prejudicial. United States v. Wihbey, 75 F.3d 761, 774 (1st Cir. 1996).

The record contains sufficient evidence to support the jury's finding that Burgos participated in a conspiracy from 1998 to 2005. Corales testified that he met Burgos in 1998. At the time, both had their own drug points and were involved in unrelated drug activities, although they knew people in common. After their meeting, he and Burgos began selling each other kilogram-quantities of cocaine. Corales went to jail, but only for six months in 2001, during which time the two remained in contact (for example, Burgos provided the ice cream for an inmate party Corales organized), and when Corales was released, Burgos gave him a job in his construction company. Sometime around 2003 or 2004, the two developed the plan to import drugs from the Dominican Republic, which only got as far as stealing a boat. When the government

asked whether the exchange of drugs between Corales and Burgos lasted throughout their seven-year relationship (meaning 1998 to 2005), Corales answered in the affirmative.[19]

The government presented no evidence that other people were involved in the conspiracy with Corales and Burgos until they began planning to import drugs sometime around 2003 or 2004. Thus, there is no evidence of a 1998-2005 conspiracy unless Corales remained a member for the entire time. Burgos argues that the gap in the government's evidence and the bare fact that Corales went to prison means that the conspiracy ended in 1999 and re-started several years later. A six-month hiatus, however, does not necessarily mean the conspiracy ended. See United States v. Alejandro-Montañez, 778 F.3d 352, 359-60 (1st Cir. 2015). Nor does the imprisonment of conspiracy members necessarily require a finding of withdrawal or abandonment. See Mangual-Santiago, 562 F.3d at 422-23.

Burgos points to two additional points that could suggest Corales withdrew from the conspiracy: the fact that he gave up his

_____

[19] The exchange followed a discussion in which Corales was unable to estimate how many kilograms of cocaine had changed hands between him and Burgos during their relationship. It consists of:

> Q: Well, is it fair to say that this relationship went on for close to seven years?
> A: Yes.
> Q: And throughout that time period, were there exchanges of drugs, either from you to him or from him to you in kilo quantities of cocaine?
> A: Yes.

own drug points; and the fact that in 1999 he agreed to testify for the government in unrelated cases. (Although defense counsel pushed Corales to admit he was "working for" or an "informant" for the government, Corales insisted that all he agreed to do was show up in court and testify.) On balance, though, while the evidence could have allowed the jury to infer that Corales withdrew from the conspiracy with Burgos and began a new conspiracy with Burgos out of the blue around 2003, it is also sufficient to support an inference that Corales never withdrew from the original conspiracy. Thus, there is no variance.

## G. Evidentiary Rulings

Finally, Burgos challenges a number of the district court's evidentiary rulings, both individually and for their cumulative impact. As a general matter, this circuit reviews evidentiary rulings for abuse of discretion. Baker v. Dalkon Shield Claimants Trust, 156 F.3d 248, 251-52 (1st Cir. 1998). However, if the evidentiary ruling rests on an interpretation of law, we review it de novo, with subsidiary fact-finding reviewed for clear error. Id.

Even if a district court errs, such error does not require reversal if it was harmless--i.e., if it can be said that "'the judgment was not substantially swayed by the error.'" United States v. Meserve, 271 F.3d 314, 329 (1st Cir. 2001) (quoting Kotteakos v. United States, 328 U.S. 750, 765 (1946)). The

government generally bears the burden of persuasion on whether an error was harmless, although an appellate court may also consider sua sponte whether an error was harmless. United States v. Rose, 104 F.3d 1408, 1414-15 (1st Cir. 1997) (holding that a court may hold that an error was harmless even if the government does not make that argument, because of the seemingly mandatory text of Fed. R. Crim. P. 52(a) and the policy interest in conserving judicial resources).

For claims that an evidentiary ruling violated the Sixth Amendment's Confrontation Clause, the error must be harmless beyond a reasonable doubt. United States v. Cameron, 699 F.3d 621, 652 (1st Cir. 2012). Cumulative errors may merit a reversal if they achieve a "critical mass" that "cast[s] a shadow upon the integrity of the verdict." United States v. Sepulveda, 15 F.3d 1161, 1196 (1st Cir. 1993).

### 1. Semidey's Hearsay Statements

Burgos argues that the district court erred in admitting Semidey's statements under the "forfeiture by wrongdoing" exception to the rule against hearsay. Fed. R. Evid. 804(b)(6). That exception allows the admission of hearsay statements "against a party that wrongfully caused--or acquiesced in wrongfully causing-- the declarant's unavailability as a witness, and did so intending that result." Id. We review for clear error the question of whether the government has demonstrated that Burgos had the

requisite intent for this exception to apply. See Baker, 156 F.3d at 252; see also United States v. Scott, 284 F.3d 758, 762 (7th Cir. 2002) (question of whether Rule 804(b)(6) applies turns on fact-finding). This circuit has not defined the standard of evidence necessary to establish the requisite intent, although for the closely analogous claim that a defendant has waived his Sixth Amendment right to confront a potential witness by murdering that witness, this circuit requires the government to prove waiver by a preponderance of the evidence, see United States v. Houlihan, 92 F.3d 1271, 1280 (1st Cir. 1996), and the majority of circuits seem to apply this standard to Rule 804(b)(6), see Davis v. Washington, 547 U.S. 813, 833 (2006). We do the same here.

Our finding that the evidence was sufficient to convict Burgos of murdering Semidey to make sure she did not share further her knowledge of his criminal activity readily disposes of this evidentiary challenge. The only wrinkle Burgos seeks to introduce is a claim that, for purposes of Rule 804(b)(6), the prosecution must prove that charges had been filed at the time he killed Semidey. This circuit has previously held that the analogous exception to the Confrontation Clause applies to the murder of witnesses in criminal investigations even before charges have been brought. Houlihan, 92 F.3d at 1280. The reasoning of that case is just as applicable here, as the rule that Burgos advocates would simply create an incentive to "murder suspected [witnesses] sooner

rather than later." Id. Thus, the forfeiture-by-wrongdoing exception is available for statements by a witness who was murdered before charges were brought if it was "reasonably foreseeable that the investigation [would] culminate in the bringing of charges." Id. Here, the district court did not clearly err in concluding that Burgos intended to prevent Semidey from testifying at a trial that, had she continued working with the government, was reasonably foreseeable to occur.

Burgos' attempt to rely on Giles v. California, 554 U.S. 353 (2008) is misplaced. That case merely established that Rule 804(b)(6) and the analogous Confrontation Clause provision do not apply without an intent to prevent testimony--i.e., the exception is not available for statements by murder victims simply because the defendant made them unavailable. Giles, 554 U.S. at 367-77. It did not announce a rule that the murder must actually follow the filing of charges.

## 2. Hearsay References To Burgos Being Under Investigation

At trial, Burgos pursued lines of attack that made relevant whether law enforcement had a preexisting investigation of or interest in Burgos prior to Semidey becoming an informant. A DEA supervisor therefore testified that he already knew Burgos as a person of interest before Semidey came into his office. Two other agents so agreed. None of the witnesses testified about what

it was that caused the agents to initially become suspicious of Burgos.

Burgos now claims that all of this was somehow inadmissable hearsay. We think not. Having placed at issue the chronology of the investigation, Burgos can hardly complain that the government put on direct witnesses who could say when they started looking at Burgos. The fact that such testimony may have implied that other persons told the agents something that caused them to focus on Burgos hardly causes their first-hand, relevant testimony concerning the investigation's status to become hearsay. None of them even related the substance of what unnamed others may have said, let alone offered it for its truth.[20] See Fed. R. Evid. 801(c)(2).

### 3. Daubert Challenge To Testimony Of Dog Handlers

At trial, the government introduced the testimony of several law enforcement officers that one of two so-called "cadaver dogs" "alerted" when led by an area on Burgos' property where one of the officers had identified a possible grave site approximately six months before. Because no human remains were discovered, the sole purpose of this testimony was to suggest that, because the dog alerted, the jury could conclude that the location had, at one point, concealed a human cadaver.

---

[20] Semidey's husband's testimony that he had heard of the investigation from the supervisor, even if it was hearsay, was harmless because it was cumulative of the admissible testimony.

Burgos objected to this testimony on several grounds, in particular that the testimony constituted, under Federal Rule of Evidence 702, an expert opinion that the cadaver dog could reliably locate a spot in which human remains had been buried, and that the government had failed to lay a proper basis for its reliability under Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993).  The district court nevertheless allowed the testimony, and Burgos now challenges that ruling on appeal.

Upon reviewing the record, we tend to agree with Burgos that the government did not lay out much of a case that a dog could reliably identify a spot in which there had been (presumably months earlier) a human cadaver, as opposed to simply responding to animal remains or to the leash-holding handler's conscious or unconscious cues.  It is one thing to use a dog to identify a place in which one might look to see if human remains are present.  It is quite another to use a dog to identify dirt that was once exposed to a human cadaver.  The prosecution witnesses offered virtually no evidence that the scientific reliability of such a use had been established, or that their investigation protocols were generally accepted for such a use.  Burgos' experts, in turn, provided easy-to-follow testimony explaining numerous basic defects in the use of the dogs for the purpose for which they were used here.  They also offered much common sense, noting, for example, that the officer

using the dog on a leash that alerted was the officer who had previously identified the suspected spot.

Ultimately, however, we need not determine whether the admission of the testimony was an abuse of discretion because it is plain that, for two reasons, any possible error was harmless. First, the government presented a large amount of much more compelling circumstantial evidence that Burgos was responsible for Semidey's death. That evidence included testimony from Semidey's brother-in-law that Burgos had repeatedly tried to confirm, and then said he had confirmed, a rumor that Semidey was an informant; testimony from Semidey's handlers that Semidey told them that Burgos had threatened to make her disappear if he found out she was working for the government; testimony from another witness that Burgos had threatened to kill that witness if he told anyone that Burgos knew that Semidey was an informant; testimony by Corales that after Burgos learned that Semidey was an informant, Burgos had asked Corales for a gun and said that Semidey was going to disappear; and testimony that Semidey was last seen in Burgos' car. The jury heard the recorded conversation between Corales and Burgos in which Burgos said that Semidey would not be found. They also heard testimony that Burgos had choked Semidey during a fight, which--even if the fight did not have to do with Semidey being an informant--demonstrated (assuming the jury found it credible) that

-45-

Burgos was capable of violence. Finally, trace DNA evidence was found in the trunk of Burgos' car.

It is no doubt true that Burgos offered evidence to the contrary. Among other things, Burgos pointed out a number of inconsistencies in the testimony of the DEA agents investigating him; established that Corales' credibility is, to put it mildly, questionable; and offered evidence that the suspicious car-washing and the DNA evidence recovered from the trunk may have had innocent explanations. On balance, though, we conclude that the evidence other than the dog alert, while circumstantial, pointed quite forcefully at Burgos.

Our second reason for this conclusion is that the testimony about the dog alert carried very little incremental probative force because its limitations would be almost certainly apparent to any reasonable jury. Even though the dog handlers' testimony was "scientific, technical, or other specialized knowledge," see Fed. R. Evid. 702, it was at the non-technical end of the spectrum. Indeed, the prosecution did not even propose it as expert testimony, and the witnesses offered no technical or jargon-laden support for their claims. The defense exposed the limitations in the handlers' claims through easy-to-follow cross-examination and persuasive testimony from an expert clearly more knowledgeable on the matter than the officers. We expect the jurors were well able to understand and evaluate these types of

arguments that a dog may not be able to distinguish soil that once contained a decomposed human from soil that once contained a decomposed animal, or that a handler walking the dog on a leash might cause the dog to alert.  In short, the testimony about the alert of a cadaver dog that found no cadaver added little to the case.

This is not to say that the district court does not have a responsibility to exercise its gatekeeper role under Rule 702 with regard to such testimony.  Indeed, in other contexts in which the government seeks to offer dog alerts as substantive evidence (for example, of the presence of an accelerant in an arson case), courts routinely test the reliability of such testimony under Daubert.  See, e.g., United States v. Marji, 158 F.3d 60, 62-63 (2d Cir. 1998) (per curiam).  It is, rather, to say that failure to conduct such an analysis, assuming it is error, is more likely to be harmless in a case such as this, in which the prosecution witnesses cited no studies or reports to buttress their experience-based observations, nor claimed any special scientific expertise, and in which the defense gave the jury ample evidence from which to judge for themselves whether a cadaver dog alert that revealed no cadaver was anything more than a false alert.

4.    **Prior Bad Acts**

At trial, the government introduced as evidence a number of recordings that Semidey had made of conversations with Burgos.

One of those recordings reveals Burgos' involvement with drug trafficking in a time frame that supports the prosecution's claim that Burgos had been involved in such activity for a long time. A portion of that recording also includes a statement that, as part of that drug trafficking conspiracy, he had served as a lookout for a murder.

Burgos objected to the evidence on two grounds: (1) that the government failed to comply with Fed. R. Evid. 404(b)(2), which requires that, upon request, the government must give notice of the evidence of prior bad acts that it seeks to offer; and (2) that the evidence was in any event inadmissible as propensity evidence prohibited by Fed. R. Evid. 404(b). The district court allowed the recording to be played, but also instructed the jury that the statements about the murder may be false and should be ignored.[21]

We begin with the notice issue. The wrinkle in Burgos' argument is that the government had provided the recordings to defense several years before trial. What it did not do was specifically call attention to the fact that they contained Rule 404(b) material, even though the defense sent an e-mail

---

[21] The district court instructed the jury as follows: "These statements by Mr. Burgos are uncorroborated and, as I mentioned to you before lunch, for all we know he may have been huffing and puffing to impress his girlfriend. Okay? You must not consider the statements regarding those incidents for the truth of those events. In other words, you must not take those things as proof that the events actually occurred or that Mr. Burgos was in any way involved in them, neither may you hold them against Mr. Burgos in any other manner."

specifically requesting such information.  We do not reject the distinct possibility that a large bulk production may well be, without more, deficient notice.  However, we need not decide whether it is so here, because even if the notice was deficient, the error was harmless.

Burgos makes no argument at all that the lack of clear notice caused him any prejudice at all.  Indeed, he does not even argue that his counsel did not know beforehand that the government would seek to play the recordings.  We also have not identified for ourselves any way that the defense strategy was hampered by lack of specific notice, and therefore conclude that the lack of specific notice was harmless.[22]

That leaves the question of whether the evidence was admissible on its merits.  On that question, Burgos argues both that the district court erred in determining the evidence to be admissible as offered for something other than propensity, and that the admission of the evidence was not harmless.  On the question of admissibility, our review is for abuse of discretion.  United States v. Rivera-Rivera, 477 F.3d 17, 20 (1st Cir. 2007).

---

[22] Burgos offers two cases that he argues stand for the proposition that the failure to provide notice of Rule 404(b) evidence cannot be harmless.  Both involve surprise testimony that hampered the defense strategy in identifiable ways.  United States v. Carrasco, 381 F.3d 1237, 1240-41 (11th Cir. 2004) (undermining a defense based on a lack of intent); United States v. Vega, 188 F.3d 1150, 1155 (9th Cir. 1999) (surprise witness prevented defense from preparing for cross-examination on the prior acts).

We cannot find that the district court abused its discretion in allowing the recording as evidence relevant to an issue other than propensity. Although the government offered the recording for purposes of dating the conspiracy, the district court also stated that it was admissible as evidence of "motive" or "opportunity." The recording confirms in Burgos' own voice that he told Semidey things to which he would certainly not want her to testify. That fact was relevant to his motive to kill her. And it also corroborated her general claim that he confided in her in that matter. To the extent that the evidence might nevertheless have been excluded as unfairly prejudicial under Rule 403, given that the government had presented other evidence of Burgos' motive, the trial court's limiting instruction to the jury tilted the balance enough to trigger our deference to such a balancing.

## 5. Cell Phone Records

Semidey owned and used a cell phone. Her telecommunications carrier was a company named Centennial, which has since been acquired by AT&T Puerto Rico. In the regular course of its business, Centennial maintained in its computer files data for each call made by each user, including Semidey. The data included the phone numbers dialed on Semidey's phone or from which it received calls; the dates, times, and durations of the calls; whether each call was incoming or outgoing; and the particular cell tower that connected the phone to the network during the call.

During trial, the government introduced as an exhibit a print-out of Centennial's data concerning Semidey's phone's activity on various dates. The government also introduced a record maintained by Centennial showing the locations of its cell towers, including those cell towers to which its records show Semidey's phone connected on the pertinent dates. Centennial's records were accompanied by a certification of the custody of Centennial's records in compliance with Fed. R. Evid. 803(6)(D) and 902(11). The government also presented testimony from a Centennial employee describing Centennial's record-keeping practices and explaining the data in the actual exhibits. The employee who testified was not the same employee who had queried Centennial's database to compile the print-out used at trial.

Burgos raised below (in connection with a motion in limine and a voir dire examination of the Centennial witness) and now presses on appeal three objections to the cell phone records.

First, Burgos contends that because the print-out of Semidey's phone records "was a highly specific document prepared pursuant to a request from law enforcement, containing only information requested by the agency," it did not qualify as an exception to the hearsay rule under Fed. R. Evid. 803(6)(B) and (D). That exception applies to documents "kept in the course of a regularly conducted activity of a business," and for which "making the record was a regular practice of that activity." Id. Burgos

devotes one sentence to this contention in a 127-page brief and cites no precedent.

Burgos' complaint about the Centennial exhibits could apply to virtually any print-out of data stored in computerized business records. This circuit has previously held that exhibits showing selected data pulled from records that a company keeps in the ordinary course of business fall under the business records exception, even if the physical exhibits themselves were made to comply with a request from law enforcement. United States v. Cameron, 699 F.3d 621, 641-42 (1st Cir. 2012) (holding that exhibits showing internet providers' records of when the defendant logged in and out of his account and the IP address from which he had logged in fell into the business records exception even though the exhibits themselves were created in response to a search warrant). Other circuits have directly held that phone records fall into the business records exception. See, e.g., United States v. Yeley-Davis, 632 F.3d 673, 678-79 (10th Cir. 2011); United States v. Green, 396 F. App'x. 573, 575 (11th Cir. 2010) (per curiam). We see no reason to disagree here.

Burgos argues, second, that the admission of the records "failed the Confrontation Clause standard set in Melendez-Diaz v. Massachusetts, 557 U.S. 305, 325 (2009)." Why this is so, Burgos does not explain. Melendez-Diaz held that business records, although not usually testimonial for purposes of triggering the

Confrontation Clause, may be testimonial if the regularly conducted business activity is the creation of evidence for trial, such as analyzing substances at a forensic lab.  See id. at 321-24.  In this case, however, the exhibits contained no data or analysis created for trial.  Rather, they were simply print-outs of data created and stored by Centennial in the course of running a phone company.

Again, Cameron is instructive.  There, even though the court concluded that records the company made in the regular course of providing internet service were not testimonial for purposes of triggering the Confrontation Clause, it held that records of the company's reports to a child pornography tip line were.  It reasoned that even though company employees made such reports as part of the regular course of business, the purpose of reviewing and reporting suspected child pornography was to facilitate law enforcement.[23]  Id. at 647-48.  "[T]o create each Report, someone at Yahoo! analyzed Yahoo!'s data, drew conclusions from that data, and then made an *entirely new* statement [the tip line Report] reflecting those conclusions. . . . This means that someone at Yahoo! analyzed Yahoo!'s business records and concluded that (1) a crime had likely been committed and (2) a particular user likely committed that crime."  Id.

_____

[23] Because the records triggered the Confrontation Clause, the court did not analyze whether they satisfied the business records exception.

Here, Centennial responded to a request for data that it had previously gathered and maintained for its own business purposes. The fact that the print-out of this data in this particular format was requested for the litigation does not turn the data contained in the print-out into information created for litigation. Rather, the physical manner in which the exhibit was generated simply reflects the fact that the business records were electronic, and hence their production required some choice and offered some flexibility in printing out only the requested information. See, e.g., Yeley-Davis, 632 F.3d at 678-79.

Third, Burgos challenges a statement by the Centennial witness that Semidey's phone was "in or around" the cell tower listed as connecting the phone during a call. She then expanded on this statement by responding in the affirmative when the government asked whether the cell tower that connected the call "was closest to the cell phone being used" when the call was initiated. Burgos argues that the witness was not qualified under Fed. R. Evid. 702 to offer testimony on the technical matter of how cell phone calls are routed through a company's towers. It does seem that the witness's responses exceeded her knowledge--nothing on the exhibit indicated that the connecting cell tower was always the closest cell tower, and the witness explained on voir dire that she did not have the knowledge or expertise to opine that the connecting cell tower was actually closer than any other cell tower.

However, we conclude that the witness's gloss was of no apparent material affect. The prosecution used the evidence to argue that Semidey must not have had her phone on July 2, shortly before she disappeared: testimony established that at around eight o'clock in the morning she was in Guánica, but the connecting tower for a call received at 7:50 a.m. was in Levittown, more than sixty miles away on the other side of the island. (This, in turn, lent indirect support to testimony by Semidey's brother-in-law that Burgos said that he had confirmed Semidey was an informant because he had her phone, and had seen that she had used it to call the DEA.) Whether or not a phone necessarily connects to the "closest" tower, any juror could have easily concluded that a cell phone would not be sixty miles away from its connecting tower. The custodian's assertion that the connecting tower is the one closest to the phone was of no significance at all in that context.

Moreover, it is not even clear who the records helped most. Burgos' counsel chose to avoid cross-examining the Centennial witness in front of the jury, and then used the exhibits in closing to make several exculpatory points, one of which involved the location of the phone. While this approach did not waive Burgos' objection to the exhibits, it does support our conclusion that the Centennial witness's opinion about which tower a phone connects to did not do real damage to Burgos' defense, and may even have helped it.

## 6.    Bolstering DNA Evidence With Hearsay

At trial, the government introduced DNA evidence that traces of Semidey's blood were found in Burgos' car.  Burgos raised a number of concerns about the analyst's methodology.  The government was allowed to elicit testimony that the department protocol was to have each analyst's work reviewed by a second analyst, and if they disagreed, then a third analyst was called.  It also elicited testimony that a third analyst was not called in this case.  Burgos argues that this constitutes de facto testimony by the second analyst that he was in agreement with the first.  Burgos argues that this violates the Confrontation Clause under Melendez-Diaz, 557 U.S. at 310-11, because Burgos was unable to cross-examine the second analyst.

Burgos points to no case prohibiting the introduction of testimony that internal review protocols had been followed unless the reviewer is available to testify.  We again have difficulty identifying this non-statement as hearsay, and also note that such a rule would create a disincentive to this sort of internal control mechanisms in forensic investigations.  As such, we decline to announce such a rule, and hold that if there was error, any error was harmless beyond a reasonable doubt because Burgos had ample opportunity to cross-examine the primary analyst.

Because we have disposed of several issues on harmless error grounds, we have also considered whether all such possible

errors  cumulatively were harmless.  We find that they were, given

how tangential the challenged evidence in question was, as compared

to the strong body of plainly admissible evidence supporting the

verdict.

### III. Conclusion

For the reasons stated above, we <u>affirm</u>.