# COURT OF APPEALS
## DECISION
## DATED AND FILED

## October 31, 2023

Samuel A. Christensen
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No. **2021AP1412-CR**

STATE OF WISCONSIN

Cir. Ct. No. 2017CF2151

IN COURT OF APPEALS
DISTRICT I

STATE OF WISCONSIN,

PLAINTIFF-RESPONDENT,

V.

KRIS V. ZOCCO,

DEFENDANT-APPELLANT.

APPEAL from a judgment and an order of the circuit court for Milwaukee County: JEFFREY A. WAGNER, Judge. *Affirmed*.

Before White, C.J., Donald, P.J., and Dugan, J.

**Per curiam opinions may not be cited in any court of this state as precedent or authority, except for the limited purposes specified in WIS. STAT. RULE 809.23(3).**

¶1    PER CURIAM.   Kris V. Zocco appeals from an amended judgment of conviction[1] entered following a jury trial for first-degree reckless homicide, hiding a corpse, and strangulation and suffocation, and an order denying his postconviction motion.   On appeal, Zocco contends that:   (1) the evidence was insufficient to convict him of first-degree reckless homicide; (2) the warrant to search Zocco's cell phone violated the Fourth Amendment's particularity requirement; (3) the cadaver dog evidence admitted during his trial should have been excluded; (4) the admission of pornography evidence during his trial constituted plain error; (5) he was deprived of effective assistance of trial counsel; and (6) he is entitled to a new trial in the interest of justice.   For the reasons discussed below, we affirm.

## BACKGROUND

¶2    On May 1, 2015, Kelly Dwyer's skeletal remains were found along a rural road in Jefferson County.   No clothes or personal items, such as a bag or shoes, were found with Dwyer's remains.   According to the Jefferson County Medical Examiner, Dwyer's body was face-down on the ground and her right arm was "underneath her torso," her left arm was "bent backwards and resting on her back," her left leg was "extended with her lower leg kind of off to the side," and her right leg was "bent backwards behind, resting kind of in a bent position as well, upward."

---

[1] The judgment of conviction was amended in this case to add restitution.  Zocco does not challenge the restitution ordered in this case, so we do not discuss it further.  *See Young v. Young*, 124 Wis. 2d 306, 317, 369 N.W.2d 178 (Ct. App. 1985) ("An issue which has not been briefed or argued on appeal is deemed abandoned.").

¶3      Dwyer was last seen alive on Friday, October 11, 2013, at 2:37 a.m. in Milwaukee entering Zocco's apartment complex. Zocco and Dwyer were in a "friends with benefits"[2] relationship.

¶4      In 2017, Zocco was charged with first-degree reckless homicide, hiding a corpse, and strangulation and suffocation. In 2018, a ten-day jury trial took place. The State argued that Zocco either manually strangled Dwyer or forced his penis down her esophagus causing her to asphyxiate and die at his apartment. The State further argued that Zocco then transported her body out of his apartment in a travel golf bag and dumped her body in Jefferson County. The defense contended that the State had failed to present sufficient evidence that Zocco caused Dwyer's death. The jury found Zocco guilty as charged, and he was sentenced to a total of thirty-one years of initial confinement and nineteen years of extended supervision.

¶5      Zocco moved for postconviction relief. After briefing, the circuit court denied Zocco's postconviction motion without a hearing. This appeal follows. Additional relevant facts are discussed below.

## DISCUSSION

¶6      On appeal, Zocco contends that: (1) the evidence was insufficient to convict him of first-degree reckless homicide; (2) the warrant to search Zocco's cell phone violated the Fourth Amendment's particularity requirement; (3) the cadaver dog evidence admitted during his trial should have been excluded; (4) the

_____

[2] Zocco told police that he and Dwyer were friends that would get together occasionally to have sex, drink, and do cocaine.

3

admission of pornography evidence during his trial constituted plain error; (5) he was deprived of effective assistance of trial counsel; and (6) he is entitled to a new trial in the interest of justice. We address each of Zocco's claims in turn.

## I.      Sufficiency of the Evidence

¶7      In this case, due to the decomposition of Dwyer's remains, no doctor or medical examiner could definitively determine the cause or manner of Dwyer's death.

¶8      Zocco contends that there was insufficient evidence supporting his first-degree reckless homicide conviction. Zocco asserts that "[a]bsent evidence of the cause or circumstances of [Dwyer's] death, the jury necessarily was left to speculate whether her death was criminal rather than accidental or natural and, if criminal, whether it was reckless rather than negligent."

¶9      When reviewing a sufficiency of the evidence claim, we may not substitute our "judgment for that of the trier of fact unless the evidence, viewed most favorably to the [S]tate and the conviction, is so lacking in probative value and force that no trier of fact, acting reasonably, could have found guilt beyond a reasonable doubt." *State v. Poellinger*, 153 Wis. 2d 493, 507, 451 N.W.2d 752 (1990). We will uphold a conviction, "[i]f any possibility exists that the trier of fact could have drawn the appropriate inferences from the evidence adduced at trial to find the requisite guilt," and we do so even if we do not believe that the trier of fact should have found guilt based on the evidence. *Id.* "It is the function of the trier of fact, and not of an appellate court, to fairly resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *State v. Bodoh*, 226 Wis. 2d 718, 727, 595 N.W.2d 330 (1999) (citation omitted). Whether the evidence in a case is sufficient to sustain a

guilty verdict is a question of law that we review independently. ***State v. Smith***, 2012 WI 91, ¶24, 342 Wis. 2d 710, 817 N.W.2d 410.

¶10     In order to convict Zocco of first-degree reckless homicide, the State bore the burden of proving that:  (1) Zocco caused the death of Dwyer; (2) Zocco caused Dwyer's death by criminally reckless conduct; and (3) the circumstances of Dwyer's death showed utter disregard for human life.  *See* WIS. STAT. § 940.02(1) (2021-22);[3] WIS JI—CRIMINAL 1022.

¶11     To start, there is no dispute in this case that Dwyer is deceased. Evidence was presented at trial that human remains were found along a rural road in Jefferson County, and Dr. Donald Simley, a forensic dentist, identified Dwyer as the deceased using her dental records.

¶12     While no doctor or medical examiner was able to definitively opine as to Dwyer's cause of death, the State presented a variety of other evidence to support that Zocco caused Dwyer's death and to rule out non-homicidal causes. As we discuss in detail below, the evidence at trial included, but was not limited to:  surveillance footage, statements from Zocco, testimony from those close to Dwyer, phone records, information relating to Zocco's whereabouts following Dwyer's disappearance, testimony relating to Zocco's apartment, cadaver dog evidence, photos and a video from Zocco's cell phone, testimony from a woman that Zocco had a sexual relationship with, and testimony from a former girlfriend. "It is well established that a finding of guilt may rest upon evidence that is entirely

---

[3] Zocco was convicted in 2018.  However, because the relevant statutory language has not changed, all references to the Wisconsin Statutes are to the 2021-22 version unless otherwise noted.

circumstantial and that circumstantial evidence is oftentimes stronger and more satisfactory than direct evidence." *Poellinger*, 153 Wis. 2d at 501.

¶13    During the trial, the State presented surveillance footage from Zocco's apartment complex, which showed Dwyer entering the lobby alone on Thursday, October 10, 2013, at 9:22 p.m., leaving with Zocco approximately twenty minutes later, and returning after 10:00 p.m.  Around midnight, on Friday, October 11, 2013, Dwyer and Zocco are seen leaving again and then returning at 2:37 a.m.  After returning to Zocco's apartment complex at 2:37 a.m., Dwyer is not seen alive again on the video.

¶14    Zocco admitted to police that he and Dwyer were together on Thursday evening and early Friday morning.  According to Zocco, they snorted cocaine and drank at Zocco's apartment, went to a local bar, and then returned to his apartment and had more drinks and cocaine.  Dwyer gave him oral sex, and then they both passed out.  They woke up at approximately 9:00 a.m. and Dwyer said she was leaving.  He then heard the door click.

¶15    On Friday morning, around 10:00 a.m., Zocco is seen on the surveillance video leaving his garage without Dwyer.  Zocco's car returned at 10:22 a.m. and Zocco parked, got out, and went and opened his trunk.  A detective testified that there was a gray object in the trunk, which could have been a golf bag, and a toolbox.  The car left again at 10:37 a.m. and returned at 10:52 a.m.

¶16    Just after noon, Zocco returned to his car in a white t-shirt and a light hat.  In a subsequent video clip at 1:43 p.m., the headlights of Zocco's car are on, he exits the car, and walks back toward the door to his apartment.  At that point, Zocco has darker-type clothing.  Zocco then shows up again at 3:34 p.m. at the back of his car with a rolling duffle-bag designed to hold bats, which he puts in his

trunk. At 5:06 p.m., he approaches his car carrying a smaller, range-type golf bag on his shoulder and places it at the rear-passenger door of the car. Finally, at 6:15 p.m., Zocco's car leaves for the evening.

¶17 Zocco told police that after Dwyer left, he got ready for work and started to drive to his office to get a document, but changed his mind and came home, where he usually worked. After his workday ended, around 6:30 p.m., Zocco said that he took sports equipment, which included golf clubs, to his parents' house in Richfield because his own apartment was getting too crowded.

¶18 The following day, Saturday, October 12, 2013, Dwyer did not show up for work, which her coworkers said was unusual for her. Dwyer's coworkers testified that they could not reach her by phone or at her apartment. Dwyer's boss contacted Zocco. According to Dwyer's boss, Zocco returned her call approximately three or four hours later and said that he was out Christmas shopping that October morning. Zocco initially said that Dwyer left his apartment at "7-ish." Later, he said "9-ish." At another point, he said he was not sure.

¶19 Dwyer's mother, who shared a phone plan with Dwyer, testified that Dwyer's phone call activity ended on Thursday, October 10, 2013, although there was a text sent to her the next day at 7:29 a.m., to which Dwyer did not respond. GPS records suggested that Dwyer's phone remained in the area of Zocco's apartment last syncing with Apple servers at 10:08 a.m. on Friday, October 11th—right as Zocco left his garage.

¶20 The State also presented testimony that from the afternoon of Friday, October 11, 2013, until the late afternoon or evening of Saturday, October 12, 2013, approximately seventeen calls to Zocco's phone went to voicemail. An

analysis of Zocco's phone records suggested that Zocco disabled or powered down his phone during that time period.

¶21     With regards to Zocco's whereabouts following Dwyer's disappearance, Erik Villarreal, a retired detective, confirmed that Zocco purchased some cheese at 9:55 a.m. on Saturday, October 12, 2013, in a store in Windsor, Wisconsin.  At 12:11 p.m. the same day, Zocco purchased a pair of shoes and a lemonade at a Delafield, Wisconsin Sports Authority store, which was thirteen miles from where Dwyer's remains were found.  Villarreal determined that it was possible for Zocco to have left the shop in Windsor and deposit Dwyer's remains at the discovery site with enough time to arrive at the Sports Authority.

¶22     On October 16, 2013, police executed a search warrant at Zocco's apartment.  The jury heard testimony that Zocco's apartment appeared to have been "very recently cleaned," and one of the bathrooms had a "strong odor of bleach[.]"  Notably, the bathroom also had a towel hanging from the shower rod, but no shower curtain.  It appeared that the shower curtain had been torn off.

¶23     In addition, the jury heard testimony that a cadaver dog was utilized at Zocco's apartment complex.  Detective Carren Corcoran testified that her trained police cadaver dog, Molly, alerted multiple times at Zocco's apartment complex.  Molly alerted to the odor of human remains on a shovel in the complex's trash room, outside one of the complex's dumpsters, at an empty parking stall, inside of a trash chute on Zocco's floor, and along the vertical seam of the exterior door to Zocco's apartment.  Inside Zocco's apartment, Molly alerted on a pile of clothes near a washer and dryer, various locations within the guest bathroom, the master bed, a black t-shirt, and near the bottom of a Swiffer Sweeper mop.  In addition, after Zocco's car was impounded, Molly alerted on the

exterior driver's side door and at the trunk. Inside the car, she alerted on a pouch and a garage door opener in the visor and the toolbox in the trunk.

¶24 The State also presented evidence that "a large quantity" of pornographic files were found on an external hard drive located in Zocco's residence. Out of the 1,020 pornographic files, 110 files involved themes of bondage, domination, sadomasochism (BDSM). Detective Sean Lips testified that this "include[d] … depictions of apparent nonconsensual conduct or conduct involving any kind of asphyxia[.]" In particular, Detective Lips detailed four files that were "representative of the bondage and domination theme and sexual assault and/or asphyxia-themed pornography found on [the] hard drive."

¶25 The State then presented information about Zocco and Dwyer's sexual relationship. The State played a video downloaded from Zocco's cell phone dated September 22, 2013, showing Zocco inserting his penis into Dwyer's mouth. The State also presented pictures taken within the same half-an-hour time frame. One of the images depicted Dwyer naked, face down on the bed with her ankles and hands restrained by men's neckties. A forensic nurse identified signs of asphyxiation in some of Dwyer's photographs. The nurse also stated that in the video "it's clear from the gagging that [Dwyer] was doing that she was struggling to take a breath."

¶26 In addition, the State presented testimony from other women who had been in a relationship with Zocco. Miss C. testified that she had engaged in a BDSM relationship with Zocco for a little over a year.[4] Miss C. testified that

---

[4] Miss C.'s real name was not used at trial for confidentiality purposes.

9

every time she engaged in oral sex with him it felt like he was impeding her breathing. Miss C. further testified that as their relationship continued, Zocco regularly ignored her requests to stop during oral sex when she needed to breathe. She would get "frantic" and use "every ounce of [her] own strength to get away so that [she] could breathe." Miss C. also stated that Zocco would use neckties to restrain her ankles and wrists and sometimes he would pinch her nose while inserting his penis in her throat.

¶27 The jury also heard from Zocco's girlfriend, Meagan P., who believed their relationship was monogamous.[5] She recalled she had dinner plans with Zocco on Friday, October 11, 2013, but he showed up late. She tried contacting him to no avail, and when he finally arrived, he said that he had brought baseball equipment and his golf clubs to his mother's house. Meagan thought it was odd that he went to his mother's house and that she had not heard from him. Zocco told her that he had been having issues with his phone and needed to get a new SIM card.

¶28 After dinner on Friday, Zocco spent the night at Meagan P.'s condo. She noted that Zocco was "very sweaty" that night, "to the point that he sweat through the sheets[.]" Zocco also stayed over again on Saturday night and seemed to suffer from "night sweats." The next day, Zocco asked her to help him find a place where he could get his vehicle detailed.

¶29 In regards to Zocco's apartment, Meagan testified that she had helped decorate, including purchasing a shower curtain, bath mats, and a picture.

---

[5] Meagan P.'s full name was not used at trial for confidentiality purposes.

When showed a photo of Zocco's guest bathroom, Meagan testified that the shower curtain and bath mats she had purchased were missing. Meagan also testified that they had the same cleaning person who would come every two weeks and clean her place and his place. She did not ever notice his place smelling like bleach and generally was not aware that he would clean. The cleaning person who Meagan and Zocco hired claimed she did not clean Zocco's apartment for two or three weeks before Dwyer's disappearance.

¶30 Meagan further testified that Zocco had a tall travel golf bag with wheels that was missing from the photos of his apartment. She also never knew Zocco to go Christmas shopping in October.

¶31 Lastly, the State presented testimony from those close to Dwyer indicating that they did not see any evidence that she was suicidal, depressed, or suffered medical conditions that could have resulted in sudden death. In addition, the State presented evidence that Dwyer was "upbeat," "very positive and full of life," and "very social."

¶32 In sum, the evidence the State presented at trial included, but was not limited to, the following: (1) Dwyer was last seen on video entering Zocco's apartment complex at 2:37 a.m. on Friday, October 11, 2013, and was not seen alive on video again; (2) Dwyer's cell phone last synced with Apple servers Friday at 10:08 a.m. in the area of Zocco's apartment; (3) on Saturday, Zocco left Milwaukee County and made a purchase a mere thirteen miles from where Dwyer's body was ultimately found; (4) Zocco's cell phone was disabled or powered down from Friday until the late afternoon or evening on Saturday; (5) Zocco's bath mat, shower curtain, and a tall travel golf bag all went missing from his apartment; (5) a cadaver dog alerted to the odor of human remains in

Zocco's apartment complex, his unit, and his car; (6) Zocco had a video of himself inserting his penis into Dwyer's mouth as she appeared to be struggling to take a breath; (7) one of Zocco's previous sex partners testified that as their relationship continued he would ignore her requests to stop during oral sex when she needed to breathe; and (8) those close to Dwyer did not see any evidence that she was suicidal, depressed, or suffered medical conditions that could have resulted in her sudden death.

¶33    Based on our review of the evidence presented, we conclude that there was sufficient evidence for the jury to convict Zocco of first-degree reckless homicide. We cannot say that the evidence "viewed most favorably to the [S]tate and the conviction, is so lacking in probative value and force that no trier of fact, acting reasonably, could have found guilt beyond a reasonable doubt." *Poellinger*, 153 Wis. 2d at 507.

## II.    Cell Phone Search Warrant

¶34    During its investigation, the State sought and secured multiple search warrants. At issue on appeal is the warrant to search Zocco's cell phone, which sought to conduct a "forensic examination" of the entire "contents" of Zocco's cell phone for evidence of the crimes of homicide, hiding a corpse, or various drug offenses. The warrant described the item to be searched as a "black Motorola 4G Verizon brand touch screen cellular phone, placed on Milwaukee Police Department inventory 13035699." In support of the warrant, Detective Tammy Tramel-McClain provided an affidavit detailing the investigation into Zocco's drug use and Dwyer's disappearance. This included describing the surveillance footage showing Dwyer entering Zocco's apartment and Zocco's statements to the police that him and Dwyer used drugs and engaged in oral sex.

¶35    Prior to trial, Zocco moved to suppress the fruits of several of the State's search warrants, including the cell phone warrant. In regards to the cell phone warrant, Zocco contended that it was "overly broad" and "fail[ed] to establish a link between Mr. Zocco's phone and the charges identified." The motion further argued that, "even if the warrant affidavit supported a probable cause determination that authorized a search of all communications on [his] phone, it failed to support expanding that search into the fishing expedition that occurred here into photographs and recordings."

¶36    The circuit court denied Zocco's motion to suppress. The court did not specifically discuss the cell phone warrant, but generally concluded that each search warrant issued was supported by probable cause.

¶37    Postconviction, Zocco renewed his challenge to the cell phone search warrant. The circuit court rejected Zocco's argument as a "hyper-technical reading of the Fourth Amendment's requirements."

¶38    The Fourth Amendment requires that a search warrant state with particularity "the place to be searched, and the persons or things to be seized." *State v. Noll*, 116 Wis. 2d 443, 450, 343 N.W.2d 391 (1984); U.S. CONST. amend. IV. The purpose of this requirement is to prevent "the government from engaging in general exploratory rummaging through a person's papers and effects in search of anything that might prove to be incriminating." *Noll*, 116 Wis. 2d at 450.

¶39    In reviewing an order granting or denying a motion to suppress, we will uphold the circuit court's findings of fact unless they are clearly erroneous, and we independently review the application of the facts to the constitutional principles. *State v. Hailes*, 2023 WI App 29, ¶12, 408 Wis. 2d 465, 992 N.W.2d

835. The interpretation of a warrant's language is a question of law that we review independently. *State v. Pinder*, 2018 WI 106, ¶24, 384 Wis. 2d 416, 919 N.W.2d 568.

¶40 Here, the warrant for Zocco's cell phone was not overbroad. As the postconviction decision observed, the cell phone warrant "identified the contents of the defendant's cell phone as the specific place and device to be searched, and it identified evidence of unlawful activity related to drug crimes and the disappearance of the victim as the object of the search."

¶41 Zocco contends that the search warrant and affidavit failed to identify the specific evidence the officers sought, where on the phone the evidence would be found, why the police suspected that evidence would be on his phone, and why police needed to search the entire phone.

¶42 In response, the State points to a Seventh Circuit case—*United States v. Bishop*, 910 F.3d 335 (7th Cir. 2018). We find *Bishop* persuasive. Similar to this case, in *Bishop*, the defendant challenged a search warrant authorizing a general search of his cell phone as violating the Fourth Amendment's particularity requirement. *Id.* at 336. The court acknowledged that the warrant allowed the police to "look at every file on his phone," but stated that the defendant was "wrong to think that this makes a warrant too general." *Id.* The court observed that "[c]riminals don't advertise where they keep evidence. A warrant authorizing a search of a house for drugs permits the police to search everywhere in the house, because 'everywhere' is where the contraband may be hidden." *Id.* at 336-37. The court stated that "[i]t is enough … if the warrant cabins the things being looked for by stating what crime is under investigation." *Id.* at 337. The court then concluded that the warrant was "as specific as

14

circumstances allowed" because the police did not know where on the phone the defendant kept the evidence. *Id.* at 337-38.

¶43    Likewise, here, the search warrant permitted the police to search any area of Zocco's phone.  However, the warrant limited the search to evidence of specific crimes—homicide, hiding a corpse, and drug crimes. *See id.* at 337.  As in *Bishop*, police would not have known where on the phone Zocco kept the evidence.  Thus, we reject Zocco's argument that the search warrant was overbroad.[6]

### III.    Cadaver Dog Evidence

¶44    Prior to trial, Zocco moved for an order to bar the State from presenting "all testimony related to canine cadaver searches performed in the investigation of this case."  Zocco argued that the cadaver dog testimony was irrelevant; the probative value of the testimony was outweighed by the danger of unfair prejudice, confusion of issues, and misleading the jury; the evidence was not lay opinion testimony; and the evidence failed to meet the requirements for expert testimony under WIS. STAT. § 907.02.

¶45    The circuit court rejected Zocco's arguments.  The court stated that the evidence was relevant because "it arguably shows that there was a cadaver in the defendant's apartment, which the [S]tate contends was Ms. Dwyer."  In addition, the court determined that Detective Corcoran qualified as an expert

---

[6] In the alternative, the State argues that even if the warrant was overbroad, suppression was inappropriate because the police relied on the warrant in good faith.  Because we conclude that the warrant was not overbroad, we do not reach the State's good faith argument. *See State v. Blalock*, 150 Wis. 2d 688, 703, 442 N.W.2d 514 (Ct. App. 1989) ("[C]ases should be decided on the narrowest possible ground[.]").

witness and the evidence was admissible. The court observed that Detective Corcoran and Molly, the cadaver dog, had "deep backgrounds in cadaver searches, [had] completed extensive trainings and achieved multiple certifications, and [were] qualified to testify before," and "that [Detective] Corcoran uses reliable principles and methods and that her testimony will be the result of reliable methods."

¶46     Postconviction, Zocco renewed his arguments that the cadaver dog evidence should not have been admitted. The circuit court again rejected Zocco's arguments, stating that it was standing by its decision to admit the evidence. The court stated that "the cadaver dog evidence in this case more than met the threshold requirements for the admissibility of the expert opinion evidence, and 'any deficiencies in the theory, methodology or application' could be (and indeed were) explored on cross-examination."

¶47     As in his postconviction motion, on appeal, Zocco contends that the cadaver dog evidence was inadmissible. We disagree.

¶48     We generally review a circuit court's ruling on the admissibility of evidence for an erroneous exercise of discretion. *See State v. Miller*, 231 Wis. 2d 447, 467, 605 N.W.2d 567 (Ct. App. 1999). A circuit court properly exercises its discretion if it "examined the relevant facts, applied a proper legal standard, and, using a demonstrated rational process, reached a reasonable conclusion." *Martindale v. Ripp*, 2001 WI 113, ¶28, 246 Wis. 2d 67, 629 N.W.2d 698. A circuit court's decision will be upheld "unless it can be said that no reasonable judge, acting on the same facts and underlying law, could reach the same conclusion." *State v. Payano*, 2009 WI 86, ¶51, 320 Wis. 2d 348, 768 N.W.2d 832 (citation omitted). If a circuit court "fails to set forth its reasoning, appellate

courts independently review the record to determine whether it provides a basis for the circuit court's exercise of discretion." ***State v. Hunt***, 2003 WI 81, ¶44, 263 Wis. 2d 1, 666 N.W.2d 771 (citation omitted).

¶49    First, the circuit court properly concluded that the cadaver dog evidence was relevant. Relevant evidence has a "tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." WIS. STAT. § 904.01. As the circuit court observed, the cadaver dog evidence "arguably shows that there was a cadaver in the defendant's apartment[.]" If Dwyer died in Zocco's apartment, this made it more probable that Zocco caused her death.

¶50    Zocco argues that Molly could not differentiate between a cadaver's odor and odors that a living person sheds, such as hair, blood, saliva, skin cells, or fingernails. Thus, Zocco suggests that Molly's alerts to locations where one would expect remains shed by living humans to be located did not make any fact of consequence any more likely than without the evidence.

¶51    At trial, however, Detective Corcoran testified that training dogs to find "very small amounts" of blood "was not useful" because "most everybody's home has some blood" in it. As a result, Detective Corcoran trained Molly using larger sources of human remains to prevent her from alerting to extremely small amounts of biological materials.

¶52    Zocco also contends that Molly was not trained in detecting residual odors and Molly's performance was "spotty" and "uncertain." However, Molly's training logs revealed that she did successfully detect residual cadaver odors on thirteen occasions. Further, while there were occasions that Molly missed odors from a known source, and alerted in some unsolved cases, this does not undermine

17

her positive alerts in other cases. *See generally* **State v. Bucki**, 2020 WI App 43, ¶69, 393 Wis. 2d 434, 947 N.W.2d 152 (stating that the admissibility of expert opinion testimony is not conditioned on it being "unassailable").

¶53 Second, we are not persuaded that the probative value of the evidence was substantially outweighed by prejudice. WISCONSIN STAT. § 904.03 provides that "[a]lthough relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury[.]" Zocco suggests that the evidence was unfairly prejudicial due to a canine's inability to differentiate between the odors of a decaying cadaver and the shed skin cells or hair of a living person. As noted above, however, the jury was presented with evidence that Molly was intentionally trained to detect larger sources of decaying human remains. Further, the jury heard that there were places Molly did not alert where one would expect to find biological materials, such as one of the bathrooms.

¶54 Finally, we reject Zocco's argument regarding reliability. Zocco argues that the circuit court erroneously exercised its discretion by focusing its analysis on the reliability of the dog or the alerts rather than the reliability of the human interpretation of the alerts. In support, Zocco points to **United States v. Burgos-Montes**, 786 F.3d 92 (1st Cir. 2015). **Burgos-Montes** notes that "[i]t is one thing to use a dog to identify a place in which one might look to see if human remains are present. It is quite another to use a dog to identify dirt that was once exposed to a human cadaver." **Id.** at 116. As the State observes, **Burgos-Montes** did not hold that cadaver dogs are inherently unreliable. Rather, the court stated that the government had failed to present sufficient evidence establishing the canine's ability to distinguish between a human cadaver and other remains or the handler's cues. **Id.**

18

¶55     In contrast, here, the State presented evidence demonstrating Molly's reliability.  As stated above, Molly demonstrated her ability to detect the residual odor of human remains on thirteen occasions.  Molly's training logs revealed that over an eight-year span, she was presented with 224 known sources of human remains, located the remains correctly 204 times, missed nineteen times, and only had a false alert one time at the start of her career.  Therefore, we conclude that the circuit court properly exercised its discretion when it admitted the cadaver dog evidence.  *See Miller*, 231 Wis. 2d at 467.

## IV.    Hard Drive Evidence

¶56     In 2013, pursuant to a search warrant, police searched an external hard drive found at Zocco's apartment for any files "which appear to contain or have any depictions of child pornography."  A forty-four-page report was prepared documenting the child pornography and including BDSM and rape fetish pictures.  After the completion of the search, Zocco was convicted of multiple child pornography charges.  On appeal, Zocco argued, and this court rejected, that the seizure of the hard drive exceeded the scope of the warrant.  *State v. Zocco*, 2018AP1145-46-CR, unpublished slip op. ¶¶1, 28 (WI App Aug. 27, 2019).

¶57     Subsequently, in preparation for the trial in this case, police took another look at the hard drive, resulting in a 333-page report with detailed information regarding 1,525 images and videos depicting pornography.  As stated above, 110 files involved themes of bondage, domination, sadomasochism (BDSM).  Detective Lips testified that this "include[d] … depictions of apparent nonconsensual conduct or conduct involving any kind of asphyxia[.]"  Detective Lips also detailed four files that were "representative of the bondage and

domination theme and sexual assault and/or asphyxia-themed pornography found on [the] hard drive."

¶58    In his postconviction motion, Zocco argued that the evidence gathered from his hard drive should have been suppressed as an unconstitutional warrantless search. Zocco argued that even if the seizure and search of the hard drive was proper in his prior case, this search was not. In addition, he argued that the State violated his due process rights by misleading the jury regarding the BDSM pornography on Zocco's hard drive. Because trial counsel did not object to these issues, Zocco asserted he was entitled to a new trial due to plain error.

¶59    In its postconviction decision, the circuit court rejected Zocco's challenge to the search of the hard drive because the law was unsettled. The court also found that the record did not support Zocco's due process claim that the evidence was false or misleading. Accordingly, the court found that there was no plain error. Zocco renews these claims on appeal.

¶60    "The plain error doctrine allows appellate courts to review errors that were otherwise waived by a party's failure to object." *State v. Jorgensen*, 2008 WI 60, ¶21, 310 Wis. 2d 138, 754 N.W.2d 77. A "plain error" is an "error so fundamental that a new trial or other relief must be granted even though the action was not objected to at the time." *Id.* (citation and internal quotation marks omitted). The defendant has the burden of proving that an unobjected to error is an obvious, substantial, and fundamental error. *Id.*, ¶23. An allegation of plain error presents a question of law that this court reviews independently. *State v. Bell*, 2018 WI 28, ¶8, 380 Wis. 2d 616, 909 N.W.2d 750.

¶61    Like the circuit court, we conclude that Zocco has failed to establish plain error when the police accessed his hard drive in preparation for trial.

¶62    In *State v. Betterly*, the defendant was suspected of falsely reporting a ring as stolen in order to collect insurance. *Id.*, 191 Wis. 2d 406, 412, 529 N.W.2d 216 (1995). The defendant was taken into custody on an unrelated matter, and during an inventory search of his person, jail staff found a ring in his pocket and placed it in a jail property box. *Id.* at 414-15. Later that day, the ring was removed from the property box and provided to the officer investigating the fraud. *Id.* at 415. The ring was identified as the stolen ring. *Id.* On appeal, our supreme court examined whether the removal of the ring from the jail property box violated the defendant's Fourth Amendment rights. *See id.* at 415, 417. The court concluded that the police could take a "second look" at the items as long as the "second look" did not exceed the extent of the first search. *Id.* at 418.

¶63    Subsequently, in *State v. Burch*, this court certified several questions of law to our supreme court, including whether an examination of a cell phone download was permissible under the "second look" doctrine. *Id.*, No. 2019AP1404-CR (WI App Oct. 20, 2020). In light of the certification, we conclude that whether the police could take a "second look" at Zocco's hard drive was not well-settled. If it was, this court would not have certified it to our supreme court.[7] Accordingly, we reject Zocco's argument that the search of the hard drive constituted plain error. *See State v. Nelson*, 2021 WI App 2, ¶48, 395 Wis. 2d 585, 954 N.W.2d 11 (stating that "[a]kin to the ineffective assistance of counsel requirement that the law must be 'clear' and 'settled' before it can be said that counsel performed deficiently … for an error to constitute 'plain error,' the error must be not only fundamental and substantial but also 'obvious' or 'clear'"

---

[7] We note that the Wisconsin Supreme Court did not ultimately address the merits of this issue. *See State v. Burch*, 2021 WI 68, ¶¶15, 35, 398 Wis. 2d 1, 961 N.W.2d 314.

(citations omitted)); *United States v. Hosseini*, 679 F.3d 544, 552 (7th Cir. 2012) (stating that an error cannot be plain if the law is unsettled).

¶64    Likewise, we reject Zocco's argument that the State violated his right to due process by presenting or relying on evidence that it knew or should have known was false.  As the postconviction court found, Zocco's claim is not supported by the record.  Contrary to Zocco's suggestion, the State did not mislead the jury into believing that *all* 110 BDSM files featured some form of breath deprivation.  Rather, Detective Lips testified that the files "*include[d]* depictions of apparent nonconsensual conduct or conduct involving any kind of asphyxia." (Emphasis added).   In addition, even if Detective Lips' testimony can be interpreted to represent that most of the images and videos involved breath deprivation, the record does not establish this as false or that the prosecutor knew it was false.  The absence of file names explicitly containing terms consistent with breath deprivation does not mean those files did not include such behavior.  Thus, we conclude that Zocco has not established a due process violation that rises to the level of plain error.  *See Jorgensen*, 310 Wis. 2d 138, ¶23.

### V.    Ineffective Assistance of Counsel

¶65    Zocco contends that if trial counsel failed to preserve his challenges to the search of his cell phone, the cadaver dog evidence, the search of Zocco's hard drive, and Detective Lip's analysis, then trial counsel was ineffective.

¶66    To prevail on a claim of ineffective assistance of counsel, a defendant must show that his or her attorney's performance was deficient as well as prejudicial to his or her defense.  *Strickland v. Washington*, 466 U.S. 668, 687 (1984).  To demonstrate deficient performance, the defendant must show that counsel's  actions  or  omissions  "fell  below  an  objective  standard  of

reasonableness." *Id.* at 688. To demonstrate prejudice, a defendant must show that counsel's deficient performance was "so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Id.* at 687. We need not address both prongs of the *Strickland* test if the defendant does not make a sufficient showing on one of the prongs. *Id.* at 697.

¶67 When deciding whether a defendant is entitled to an evidentiary hearing based on an ineffective assistance of counsel claim, we first independently determine "whether the motion on its face alleges sufficient material facts that, if true, would entitle the defendant to relief." *State v. Ruffin*, 2022 WI 34, ¶27, 401 Wis. 2d 619, 974 N.W.2d 432. "Whether the record conclusively demonstrates that the defendant is entitled to no relief is also a question of law we review independently." *State v. Spencer*, 2022 WI 56, ¶23, 403 Wis. 2d 86, 976 N.W.2d 383 (citations omitted). "If the record conclusively demonstrates the defendant is not entitled to relief, the circuit court has the discretion to decide whether to hold a hearing, which we review for an erroneous exercise of discretion." *Id.*

¶68 Here, the record conclusively shows that Zocco is not entitled to relief. As discussed above, in regards to the search of Zocco's cell phone, the cadaver dog evidence, and Detective Lips' testimony, Zocco's arguments fail. Trial counsel cannot be ineffective for raising a meritless argument. *See State v. Wheat*, 2002 WI App 153, ¶23, 256 Wis. 2d 270, 647 N.W.2d 441. In regards to the search of the hard drive, as discussed above, the law is unsettled. When the law is unsettled, trial counsel is not ineffective for failing to raise the issue. *See State v. Breitzman*, 2017 WI 100, ¶48, 378 Wis. 2d 431, 904 N.W.2d 93.

¶69    Therefore, the record conclusively shows that Zocco is not entitled to relief and the circuit court properly denied Zocco's postconviction motion without an evidentiary hearing.

## VI.    New Trial in the Interest of Justice

¶70    Finally, Zocco argues that "the combined effect of the identified errors" entitle him to a new trial in the interest of justice because the "real controversy has not been fully tried." *See* WIS. STAT. § 752.35. "The power to grant a new trial when it appears the real controversy has not been fully tried 'is formidable, and should be exercised sparingly and with great caution.'" ***State v. Sugden***, 2010 WI App 166, ¶37, 330 Wis. 2d 628, 795 N.W.2d 456 (citation omitted). We exercise our power to grant a discretionary reversal only in exceptional cases. *Id.*

¶71    Based on our review of the record, we conclude that this is not an exceptional case warranting a new trial in the interest of justice. As discussed above, we reject Zocco's arguments and he has not presented any other basis that would justify the exercise of our discretionary reversal power. Therefore, for all of the reasons above, we affirm.

*By the Court.*—Judgment and order affirmed.

This opinion will not be published. *See* WIS. STAT. RULE 809.23(1)(b)5.